IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE L. ANDERSON, | ) | CASE NO.  3:20-CV-02728-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Michelle Anderson ("Plaintiff" or "Anderson"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In December 2018, Anderson filed applications for POD, DIB, and SSI, alleging a disability onset date of November 30, 2016 and claiming she was disabled due to bipolar disorder, schizophrenia, and an inability to read and write.  (Transcript ("Tr.") at 11, 233, 251.)  The applications were denied initially and upon reconsideration, and Anderson requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 11.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On February 12, 2020, an ALJ held a hearing, during which Anderson, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 31, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 11-20.)  The ALJ' s decision became final on October 14, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On December 8, 2020, Anderson filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 18-19.) Anderson asserts the following assignments of error:

(1)   The ALJ's Step Three analysis fails to evaluate and discuss evidence of an intellectual disability in light of Listing 12.05, and is not supported by substantial evidence.

(Doc. No. 16 at 2.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Anderson was born in December 1980 and was 39 years-old at the time of her administrative hearing (Tr. 19), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a limited education and is able to communicate in English.  (Tr. 19.) She has past relevant work as a delivery driver.  (*Id.* at 18.)

### B.    Relevant Medical Evidence[2]

On September 23, 1996, at 15 years old, Anderson underwent intellectual functioning testing through her school, Penta Career Center. (*Id.* at 477.)  Results from the Weschler Intelligence Scale for Children-III exam revealed a verbal IQ scale of 63, performance IQ of 66, and a full-scale IQ of 62. (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Anderson only challenges the ALJ's mental findings, the Court further limits its discussion of the evidence to Anderson's mental impairments.

These findings all fell within the mild mental retardation range and resulted in a determination that Anderson would need continued special education services.  (*Id.*)

In February 1999, a Penta Career Center IEP report indicated Anderson's reading, spelling, and math abilities tested within the 4th grade levels.  (*Id.* at 464.)  The IEP report described Anderson as having a difficult time remaining employed and having numerous jobs during the past two years.  (*Id.*)  Anderson tended to lose jobs due to being late to work, not showing up for work, poor co-worker and employer relations, and poor-quality work.  (*Id.*)  These same areas of concerns had prevented Anderson from meeting certain IEP objectives.  (*Id.*)

On March 5, 2014, treatment providers admitted Anderson to Flowers Hospital after she presented to the emergency room "in a state which was very akin to mania."  (*Id.* at 3678.)  Anderson presented with flight of ideas, poor concentration, and a belief that her cat and dog were talking to each other.  (*Id.*)  Anderson had not slept for three days and was fighting and arguing with her husband in the ER.  (*Id.*)  Treatment providers placed Anderson in the psychiatric ICU for her own safety and security.  (*Id.*)  On examination, treatment providers found good eye contact, elevated mood and affect, pressured speech, flight of ideas, racing thoughts, increased impulsivity, slightly impaired attention and concentration, adequate intelligence and fund of knowledge, and "superficially present" insight and judgment.  (*Id.*)  Diagnoses upon admission were bipolar disorder, not otherwise specified, anxiety disorder, not otherwise specified, and possible attention deficit hyperactivity disorder, combined type.  (*Id.* at 3679.)

Anderson remained hospitalized until March 9, 2014.  (*Id.* at 3684.)  On examination at discharge, Anderson made good eye contact and demonstrated a euthymic mood, "less than normal" attention and concentration, adequate intelligence, fund of knowledge, and cognition, "mildly concrete abstraction," and superficially present insight and judgment.  (*Id.* at 3685.)  Diagnoses at discharge were bipolar disorder,

3

not otherwise specified, anxiety disorder, not otherwise specified, and attention deficit hyperactivity disorder, combined type. (*Id.*)

On March 15, 2016, Anderson underwent a consultative psychological evaluation by James Tanley Ph.D. (*Id.* at 501.) Anderson reported she was bipolar but did not wish to describe her symptoms to Dr. Tanley. (*Id.*) Anderson told Dr. Tanley she did not like going places by herself and that she had not taken medication for over a year because it made her feel like a zombie. (*Id.* at 501-02.) Anderson reported education through the 11th grade and that she was a "slow learner." (*Id.* at 502.) Other students made fun of her, although she got along okay with teachers. (*Id.*) Anderson reported getting along okay with other people. (*Id.*) The longest job Anderson had was a cashier at a Shell gas station for one year. (*Id.*) They had her working all three shifts in one week and she could not sleep. (*Id.*) She worked in a factory for six months before "getting into it" with her boss and quitting. (*Id.*) Anderson denied any current mental health treatment. (*Id.* at 502-03.) Anderson reported waking up between 1 p.m. and 2 p.m., cleaning, playing video games, going grocery shopping with her husband, using Facebook, watching television, listening to the radio, and going to bed between 11 p.m. and midnight, although she did not fall asleep until 1 a.m. or 2 a.m. (*Id.* at 503.)

On examination, Dr. Tanely found Anderson "reasonably cooperative" with the exception of her unwillingness to talk about her bipolar symptoms. (*Id.*) Dr. Tanley noted normal grooming and motor behavior, as well as adequate speed and volume of speech and coherent, relevant, and goal-oriented thought processes. (*Id.*) Anderson demonstrated appropriate affect and good eye contact. (*Id.*) Dr. Tanley noted no signs of anxiety. (*Id.*) Anderson remembered six digits forward and three backward, although she needed a reminder for the backward task. (*Id.*) Anderson "quickly and flawlessly counted backwards and recited the alphabet," although she made two mistakes in serial three addition. (*Id.* at 504.) Anderson remembered two out of three items after five minutes with interference. (*Id.*) Based upon these

tasks and others, as well as her reported education and work histories, Dr. Tanley determined Anderson had an average range of cognitive functioning. (*Id.*) No psychological testing was requested or conducted. (*Id.*) Dr. Tanley diagnosed Anderson with unspecified bipolar disorder, currently depressed, moderate severity. (*Id.*) Dr. Tanley estimated Anderson's intellect was in the average range, which would be expected of her in a work setting. (*Id.* at 505.) While Anderson "would be expected to show little or no difficulty with tasks of increasing complexity and multistep tasks," the worsening of mood problems "could negatively impact" her ability to focus and concentrate. (*Id.*) Given Anderson's past incident with a supervisor and her current problems, Dr. Tanley opined Anderson "would likely be at some risk for trying to deal with the free and easy commerce of social interaction on the job." (*Id.*) Dr. Tanley further opined that Anderson's "current mood problems could lower her frustration tolerance a bit and put her somewhat at risk for the pressures of work." (*Id.*)

On December 28, 2016, Anderson underwent a psychiatric evaluation at Unison Behavioral Healthcare following release from a hospitalization from December 18, 2016 through December 24, 2016. (*Id.* at 1131.) Amanda Sherry, MA, PC-CR, noted Anderson and her husband argued throughout the assessment. (*Id.*) Anderson reported she could hear her family members laughing during the assessment and demonstrated disorganized speech, incoherence, and thought derailment. (*Id.*) Anderson told Sherry she wanted someone like a friend to talk to and no other services. (*Id.*) Anderson reported she and her husband had a difficult relationship. (*Id.*) Anderson told Sherry she had last worked at Mid-states Bolt and Screw and had been fired for smoking in the bathroom. (*Id.* at 1132.) On examination, Anderson demonstrated psychosis, although she was cooperative and answered all questions. (*Id.* at 1133-34.) While Anderson accepted a referral for individual therapy, she declined psychiatric services. (*Id.* at 1134.)

On January 6, 2017, Anderson went to the emergency room presenting with reported auditory and visual hallucinations and agitated, anxious, and aggressive behavior. (*Id.* at 514.) Anderson reportedly

had assaulted family members at home.  (*Id.*)  Treatment providers noted Anderson was not taking any medications and her history was somewhat limited as Anderson was in denial and avoiding a lot of questions.  (*Id.*)  On examination, Anderson demonstrated a flat and depressed mood, anxiousness, poor judgment, and abnormal thought content.  (*Id.* at 517.)  Treatment providers pink slipped Anderson for involuntary admission.  (*Id.*)  During a mental status examination, Anderson was "cooperative but poorly informative" with a superficial affect and labile mood and  a disorganized thought process showing looseness of association and tangentiality.  (*Id.* at 520.)  Treatment providers noted Anderson was "very bizarre, psychotic, paranoid," and "out of contact with reality."  (*Id.*)  While Anderson was alert, her orientation, memory, and intellectual functions could not be evaluated because of the severity of her psychosis.  (*Id.*)  Anderson showed poor judgment and no insight.  (*Id.*)  Anderson responded well to medication and therapy while admitted, and her mood and reality testing improved.  (*Id.* at 521.)  Treatment providers discharged Anderson on January 20, 2017 with a final diagnosis of bipolar disorder with psychotic features.  (*Id.* at 520-21.)

On January 23, 2017, Anderson underwent another psychiatric evaluation at Unison. (*Id.* at 1145.) While Anderson had been compliant with her medication, she wanted to change medication as she was getting headaches every day with her current dose of Latuda.  (*Id.*)  On examination, Anderson was cooperative and friendly, "very disorganized at times and tangential," although she was able to redirect, and she answered questions appropriately.  (*Id.*)  Katheryn Palmer, PMHCNS-BC, noted Anderson appeared stable at that time and seemed insightful about her treatment and her need for medication.  (*Id.*) Anderson demonstrated clear speech and concentration and focus that was "appropriate for the most part," and she appeared to have average intelligence, fair insight, and fair judgment.  (*Id.* at 1147.)  Palmer switched Anderson from Latuda to Vraylar.  (*Id.*)

On September 27, 2017, saw Peggyanne Klein, RN, requesting a decrease in her medication because her family was concerned about her flat affect and that she would not respond when her family talked to her.  (*Id.* at 1218.)  On examination, Anderson demonstrated stable mood, organized thought process, flat affect, good eye contact, appropriate speech, fair hygiene, intact memory, normal intellect, and adequate concentration.  (*Id.*)  Anderson reported drinking beer on the weekends, and Klein educated her on the decreased effectiveness of her medication when using alcohol.  (*Id.*)  Klein reduced Anderson's dosage of Vraylar.  (*Id.*)

On February 18, 2018, Anderson's husband brought her to the emergency room with concerns for Anderson's increased stress and feelings of being overwhelmed.  (*Id.* at 638.)  Anderson reported a good friend of hers was dying of cancer and she had gone to the funeral of her 41-year-old cousin the day before.  (*Id.*)  Anderson told treatment providers she was compliant with her medication.  (*Id.*)  Anderson babysat for a living and expressed she had been afraid to ask for a raise.  (*Id.* at 639.)  On examination, Anderson appeared stressed and depressed and demonstrated a flat affect.  (*Id.* at 639, 642.)  Anderson asked to be admitted for "at least" one night so she could receive counseling and group therapy.  (*Id.* at 643.)  Treatment providers noted Anderson did not meet admission criteria and determined it was okay to discharge her home.  (*Id.*)  Treatment providers directed Anderson to follow up with her family doctor or clinic in one to two days.  (*Id.*)

On February 23, 2018, Anderson went to the emergency room presenting with suicidal thoughts but no specific plan.  (*Id.* at 649.)  Anderson reported she had been thinking of killing herself for the past week; she was feeling depressed and did not want to live any longer.  (*Id.*)  Anderson told treatment providers these feelings had been brought on by stress and financial difficulties.  (*Id.*)  Treatment providers noted a history of depression and bipolar disorder, as well as alcohol abuse, although Anderson reported being sober for the past three months.  (*Id.*)  Anderson was admitted for inpatient psychiatric

treatment. (*Id.* at 653.) On February 26, 2018, treatment providers discharged Anderson with a diagnosis of bipolar 1 disorder. (*Id.* at 654.) On examination at the time of discharge, Anderson demonstrated cooperative behavior, good eye contact, organized thought process, intact recent and remote memory, and fair judgment. (*Id.* at 655.)

Anderson received mental health treatment at Unison from March through June 2018. (*Id.* at 1188-93, 1208-13.) Anderson's symptoms waxed and waned during this time. (*Id.*)

On September 1, 2018, Anderson went to the emergency room reporting she did not feel right, although she could not explain further. (*Id.* at 913.) Anderson told treatment providers she felt better and felt safe going home. (*Id.*) On examination, Anderson demonstrated normal mood and affect. (*Id.* at 914.)

On September 4, 2018, Anderson returned to the emergency room for psychiatric evaluation. (*Id.* at 920.) Anderson reported feeling depressed and lacking motivation, although she said she was okay and denied suicidal and homicidal ideation. (*Id.*) Treatment providers noted Anderson demanded the behavioral health team edit their findings so she could be admitted. (*Id.* at 925.)

On September 14, 2018, Anderson went to the emergency room with her husband reporting auditory hallucinations. (*Id.* at 932-33.) Anderson reported hearing voices saying, "I want to die" and that she had stopped taking her medication because of weight gain. (*Id.* at 933.) Treatment providers noted she had been seen at the emergency room several times over the past ten days. (*Id.*) A hospital social worker discussed the case with Dr. Gupta, who wanted Anderson admitted to the behavioral unit. (*Id.* at 937.) Dr. Gupta noted Anderson's reported timeline of when she stopped taking her medication and side effects did not fit. (*Id.* at 940.) Dr. Gupta discharged Anderson on September 17, 2018 with a diagnosis of bipolar affective disorder with psychosis. (*Id.*) On examination at discharge, Anderson demonstrated organized thought process and insight into treatment compliance. (*Id.*) Dr. Gupta noted Anderson had

8

been making rational and realistic plans, had been "bright, reactive, and interacting appropriately with staff and peers," had tolerated her medication changes without adverse side effects, and had gone several consecutive days without suicidal thoughts or safety concerns. (*Id.*)

On September 27, 2018, Anderson saw Margaret Overley, MA, LPC, at Unison for therapy. (*Id.* at 1186.) Anderson reported she had been hospitalized recently after failing to take her medications. (*Id.*) Overley described Anderson as "tangential," and she had "a great deal of difficulty staying on topic during the session." (*Id.*) Anderson reported she wanted to get her GED and apply for Social Security. (*Id.*) Anderson told Overley she was concerned about her diagnosis and would rather be diagnosed with bipolar disorder. (*Id.*) On examination, Overley found Anderson had a depressed mood and expansive affect, disorganized and tangential thought process, agitated and restless behavior, appropriate speech, impaired remote memory, intact recent memory, normal intellect, adequate concentration, and paranoia. (*Id.*)

Anderson received mental health treatment at Unison from September through December 2018. (*Id.* at 1178-85, 1196-1205.) Anderson's symptoms waxed and waned during this time. (*Id.*)

On December 19, 2018, Dr. Gupta noted Anderson was "really sharp" that day with a "bright affect" and she was "quick and linear in terms of cognition." (*Id.* at 1232.) On examination, Dr. Gupta found normal psychomotor activity and speech, "okay" mood, congruent affect, intact memory, attention, and concentration, linear thought form, and fair insight and judgment. (*Id.*)

On January 26, 2019, Anderson went to the emergency room with complaints of depression after her brother committed suicide a week before. (*Id.* at 3749.) Anderson was tearful but "100% adamant that she was not suicidal." (*Id.* at 3750.) Treatment providers determined Anderson did not meet admission criteria at that time. (*Id.*)

Anderson received mental health treatment at Unison throughout 2019. (*Id.* at 3590-3607, 3637-40, 3628-36, 3644-50, 3891-3934, 3998-4011.) Anderson's symptoms waxed and waned during this time.

9

(*Id.*)  During several sessions, Dr. Gupta noted Anderson was "really sharp, quick and linear in terms of cognition."  (*See, e.g., id.* at 3891, 3906, 3998.)

## C.    State Agency Reports

On April 5, 2019, Lisa Foulk, Psy.D., opined that Anderson had moderate limitations in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 240.)  Dr. Foulk further opined Anderson was capable of understanding, remembering, and following "1-23 step repetitive tasks."  (*Id.* at 244.)  While Anderson lacked the "capacity for detailed/complex tasks," she could "complete 1-2 step simple routine tasks with no fast pace."  (*Id.* at 245.)  Dr. Foulk further opined Anderson could interact with others on a "superficial and intermittent basis" and changes "should be well-explained and introduced slowly."  (*Id.*)

On June 23, 2019, on reconsideration, Irma Johnson, PsyD., affirmed Dr. Fuolk's findings.  (*Id.* at 256-57, 261-62.)

## D.    Hearing Testimony

During the February 12, 2020 hearing, Anderson testified to the following:

- She lives on the first floor of a duplex with her husband and 17-year-old twins.  (*Id.* at 187-88.)  One of her children is homeschooled.  (*Id.* at 188.)  She makes sure her child is doing his home schooling.  (*Id.* at 203.)  Her children do not participate in extracurricular activities.  (*Id.* at 204.)

- She answered the phone for her husband's roofing business for five years.  (*Id.* at 188-89.)  Her husband's brother does it now.  (*Id.* at 189.)  She cannot spell correctly and has bad handwriting, so it was difficult for her husband to read her writing.  (*Id.* at 207.)

- She has a driver's license and drives herself to daily AA meetings.  (*Id.* at 189-90.)  They are only five to ten minutes away.  (*Id.* at 190.)  Some of the AA meetings have 60-70 attendees.  (*Id.* at 202.)  She drives five to ten minutes to visit her parents in Toledo regularly.  (*Id.* at 190.)

- She quit school in the 12th grade after her grandmother died.  (*Id.* at 191.)  She was in special education classes.  (*Id.*)  She can read, but she cannot understand what she reads.  (*Id.*)  She can read a recipe if it has short words.  (*Id.* at 192.)  She can add and

subtract.  (*Id.*)  She pays the gas and electric bills, but her husband manages the bank account.  (*Id.*)  She pays the gas and electric bills with money orders.  (*Id.* at 193.)

- She was fired from her most recent job packaging pans.  (*Id.* at 193-94, 197.)  She has been fired from other jobs for smoking in the bathroom, being on her cell phone, and people putting stuff in her water.  (*Id.* at 209.)

- She cannot work now because she cannot get along with people and she cannot read or spell.  (*Id.* at 199.)  She feels like coworkers are talking behind her back or trying to start things.  (*Id.* at 199-200.)  She did not think she could do a job where she worked by herself, but she could not explain why.  (*Id.* at 200.)

- She grocery shops by herself four to five times a month for a half hour to an hour.  (*Id.* at 201.)  She has a teacup Yorkie that she cares for.  (*Id.* at 204-05.)

- She takes Vraylar for her mental health symptoms.  (*Id.* at 205.)  She has been on that medication for at least two years.  (*Id.*)  She had not been to the hospital since 2019 and had not been admitted for mental health problems since 2018.  (*Id.* at 206.)  Before her most recent hospitalization she had stopped taking her medication because she didn't like how it made her feel.  (*Id.*)

- She does not do chores because she is not motivated to do it.  (*Id.* at 207.)  Her mother, children, and her husband do the chores.  (*Id.*)

During the February 12, 2020 hearing, Anderson's husband testified to the following:

- Anderson tried to answer the phone for his roofing business, but she had to ask the caller to repeat their name several times and how to spell it, and even then, it would be wrong, so he would have to call the person back himself.  (*Id.* at 213.)  She would misspell things, not hear things properly, would lose focus on things, and sometimes she would not even answer the phone because she did not hear it ringing.  (*Id.* at 213-14.)  Anderson attempted to answer the phone for him for five years.  (*Id.* at 214.)  Even after Anderson stopped drinking, she could not properly answer the phone.  (*Id.* at 216-17.)

- Anderson experiences schizophrenic episodes where she sees or hears things.  (*Id.* at 214.)  He has witnessed these episodes.  (*Id.* at 214-15.)

- Anderson cannot hold a job.  (*Id.* at 216.)  She has been hired and fired many times.  (*Id.*)

- Anderson has problems getting along with people.  (*Id.* at 218.)  She quits jobs because she thinks people are talking behind her back.  (*Id.*)  She has confronted people about talking about her or threatening to beat her up, and investigation by management revealed the other employees did not even talk to her half the time.  (*Id.*)

- One doctor told them that Anderson should not work because she is a danger to herself and others.  (*Id.* at 219.)

11

The VE testified Anderson had past work as a delivery driver.  (*Id.* at 223.)  The ALJ then posed the following hypothetical question:

> Assume an individual of the claimant's age, education, and experience, has the residual functional capacity for light work, can never push or pull with the left lower extremity, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently stoop, kneel, and crouch, never crawl.  Avoid all exposure to hazards.  Can understand, remember, and carry out simple instructions, perform simple, routine, and repetitive tasks, but not at a production-rate pace such as an assembly line, adapt to routine changes in the workplace that are infrequent, and easily explained.  Interact occasionally with supervisors and coworkers, and never with the general public.  Would the individual be able to perform the past work?

(*Id.* at 223-24.)

The VE testified the hypothetical individual would not be able to perform Anderson's past work as a delivery driver.  (*Id.* at 224.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as laundry worker, housekeeper, and inspector and hand packager.  (*Id.*)  The ALJ asked the VE whether those jobs would still be available with a limitation to a reasoning level of one or two.  (*Id.* at 225.)  The VE testified the jobs remained.  (*Id.*)  In response to additional questions from the ALJ, the VE testified the identified jobs did not require reading or writing as part of the general job duties.  (*Id.* at 225-26.)

In response to questioning from Anderson's counsel, the VE testified it was not inconsistent to say that "a simple, routine, repetitive task job could have a reasoning level of two, and still be a simple, routine, repetitive task job because what we're talking about is the instructions, not the task themselves." (*Id.* at 227-29.)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

12

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment

13

does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Anderson was insured on her alleged disability onset date, November 30, 2016, and remained insured through June 30, 2020, her date last insured ("DLI").  (Tr. 11.)  Therefore, in order to be entitled to POD and DIB, Anderson must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.

2.    The claimant has not engaged in substantial gainful activity since November 30, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: obesity, sprain of the left ankle, avulsion fracture, status post Brostrom repair surgery, recurrent pleural effusions, episodes of bronchitis, bipolar I disorder, schizoaffective disorder, alcohol abuse in remission (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can never push and pull with left [sic] lower extremity.  She can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can frequently balance, stoop, kneel and crouch.  She must avoid all exposure to hazards.  The claimant can understand, remember, and carry out simple instructions and perform simple, routine, and repetitive tasks but not at a production rate pace such as in an assembly line.  She can adapt to routine changes in the workplace that are infrequent and easily explained and can interact occasionally with supervisors and coworkers, but never with the general public.  She must avoid concentrated exposure to fumes, odors, dusts, etc.  The job should not require reading or writing.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on December **, 1980 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-20.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

16

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole assignment of error, Anderson argues the ALJ erred at Step Three[3] by failing to: (1) "consider evidence of significant cognitive and intellectual impairments"; (2) "evaluate evidence regarding such impairments in light of the relevant listing"; and (3) "offer an explained conclusion with respect to the listing for intellectual disability [12.05]." (Doc. No 16 at 15.)  Anderson asserts:

> Despite evidence of record documenting a full-scale IQ of 62 and a history of repeated job losses due to poor performance, inability to maintain regular attendance, and difficulty interacting with co-workers and supervisors, and despite counsel's argument at hearing calling attention to it, ALJ Sher's discussion at steps two and three of the sequential evaluation process contains no reference to such evidence, and no explanation for rejecting it.

(*Id.*)

The Commissioner argues substantial evidence supports the ALJ's listing determinations.  (Doc. No. 18 at 13.)    The Commissioner characterizes Anderson's argument as "an unfocused, scattershot attack on the ALJ's Step Two and Step Three analyses."  (*Id.* at 12.)  The Commissioner asserts Anderson failed to make a Listing 12.05 argument "at any stage" before judicial review, and Anderson complains of the ALJ's alleged failure "to take adequate notice of Plaintiff's school records that predated her alleged date of onset by nearly two decades."[4]  (*Id.* at 12.)

---

[3] Although Anderson also asserts the ALJ erred at Step Two, she does not identify what additional severe impairments the ALJ should have recognized at Step Two.  (Doc. No. 16 at 15-20.)  In addition, Anderson appears to have confused Steps Two and Three at one point, as she asserts that "The ALJ's *step two analysis* found that Plaintiff had a moderate limitation in understanding, remembering and applying information . . . ."  (*Id.* at 16) (emphasis added).

[4] In this instance, the Commissioner's argument about the timing is misplaced, as the timing requirement for Listing 12.05(B) requires onset before age 22.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.05.

Anderson disputes the fact that she did not raise a Listing 12.05 argument prior to judicial review, asserting that counsel called the ALJ's attention to her school records and intellectual ability at the hearing.  (Doc. No. 19 at 1-2.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1520(c)(3), 416.920(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments

in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)). *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

However, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett*, 2015 WL 853425, at *16. *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. Mar. 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1520(a)(1), 416.945(a)(1). A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1520(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. §§ 404.1520(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to

acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

To satisfy the requirements of Listing 12.05(B),[5] a claimant must have the following:

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

a. Understand, remember, or apply information (see 12.00E1); or

b. Interact with others (see 12.00E2); or

---

[5] Anderson concedes it is Listing 12.05(B) at issue. (Doc. No. 19 at 8.)

c. Concentrate, persist, or maintain pace (see 12.00E3); or

d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App'x 1.

At Step Three, the ALJ found as follows:

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03 (*schizophrenia spectrum and other psychotic disorders*) and 12.04 (*depressive, bipolar and related disorders).*  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation.  She reports difficulty understanding and following instructions coupled with an inability to read (Exhibit 5E/3).  However, she is expected to function within average intelligence range (Exhibit 2F/6).

In interacting with others, the claimant has a moderate limitation.  She claims to "do alright with people".  However, she got into an argument with a boss that combined with mood problems would likely place her at risk with social interactions in the workplace (Exhibit 2F/6)[.]

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  Worsening mood problems would interfere with her ability to focus and concentrate (Exhibit 2F/6).

As for adapting or managing oneself, the claimant has experienced a moderate limitation.  Her current mood problems could lower her frustration tolerance placing her at risk for pressures of work (Exhibit 2F/6)[.]

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  Furthermore, the severity of the claimant's mental

impairments does not meet the C criteria.  There are no two (2) years of medically documented history and evidence of both 1 medical treatment, mental health therapy, psychosocial support, or highly structured setting that is ongoing and that diminishes symptoms and signs of the mental disorder. 2 marginal adjustment, that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life.

(Tr. 14-15) (emphasis in original).

In his RFC analysis, the ALJ further found as follows:

Consultative examiner James C[.] Tanley, Ph.D., saw the claimant in March 2016, for a disability evaluation in connection with prior applications.  The claimant reported two psychiatric hospitalizations in 2014 for bipolar disorder but was not on medication or in mental health treatment at the time of the interview.  She appeared to function within the average range of intelligence.  Dr. Tanley offered diagnosis of unspecified bipolar disorder, currently depressed, moderate severity (Exhibit 2F).  The record documents an involuntary psychiatric hospitalization of 14 days [sic] January 2017.  The claimant seemed to be having auditory and visual hallucinations.  She was agitated, anxious, aggressive and assaulting family members at home.  She was not taking psychotropic medications at the time. Discharge diagnoses was bipolar disorder with psychotic features (Exhibit 3F/8). Since, she follows at Unison, for schizoaffective disorder and bipolar disorder. Medication compliance has been a problem (Exhibits 6F, 11F, 13F, 20F, 23F, testimony).

The claimant went to the emergency room in February 2018, feeling stressed for several days.  She had remained sober from alcohol for almost three months and wanted to be admitted but did not meet the requirements (Exhibit 3F/132).  She was in the hospital a few days later with suicidal ideations at a time when she was overwhelmed and stressed with financial concerns.  She [sic] treated for bipolar I disorder, a severe depression episode and grief reaction (Exhibit 3F/181).  She continued attending AA meetings and maintaining remission (Exhibit 7F/34). The record reflects several emergency room visits and one psychiatric admission in September 2018 complaining of depression and hallucinations upon not taking her psychotropic medications that caused weight gain (Exhibit 3F/427).  She testified that she has not been to the emergency room since.  She continues to take her medications although she does not like how they make her feel.  She has maintained sobriety and regularly attended AA meetings for two years (hearing).

The undersigned carefully considered the claimant's statements concerning her impairments and their effect on the ability to perform work activity and finds the record, as a whole, does not demonstrate the existence of limitations severe enough to preclude the performance of all work on a regular and continuing basis. The claimant admits she can function better since she is sober, but contends with significant difficulties getting along with others.  She also testified to not being in the emergency room since 2018 and to taking her medications despite not liking

how [sic] make her feel (testimony). Dwayne Anderson, the claimant's spouse, testified she tried but was unable to answer the phones for his roofing business because of her spelling and loss of focus. She was not rude to others and there were no complaints about how she treated callers. Mr. Anderson does not believe she has tried working since she stopped drinking. He did witness episodes of hearing and seeing things, the last time in 2018 before her admission to St. Charles (hearing). The claimant asserts she does not get along with others but she shops at the stores four to five times per month and regularly attends AA meetings, many of which have 60 to 70 attendees.

While the record does demonstrate that the claimant has continued severe impairments, there are no indications of record that these impairments cause disabling limitations. Examinations, as discussed above, showed stability of her chronic conditions with treatment, including her mental health symptoms. The residual functional capacity assessment set forth herein, incorporates the onset, nature, intensity, and duration of residual symptoms, as well as precipitating and aggravating factors. Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of the evidence of record[.]

(Tr. 17-18.)

As Anderson points out, the ALJ did not discuss Listing 12.05 at Step Three.[6] (*Id.* at 14-15.) The Southern District of Ohio recently addressed a similar argument:

In this case, the ALJ did not err by failing to consider Listing 12.05B because the record did not raise a substantial question as to whether Plaintiff met that Listing. When ALJ Herring considered other Listings at Step Three (Listings 12.04, 12.06, 12.08, 12.11, and 12.15), she determined that Plaintiff did not meet the "paragraph B" criteria for those Listings. That paragraph B criteria requires a claimant's "mental disorder" to result in "extreme" limitations in one out of four, or "marked" limitations in two out of four, areas of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. Those four areas of mental functioning are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* ALJ Herring determined that Plaintiff had only moderate limitations in all four of those areas. (R. at 20–21.)

---

[6] Despite Anderson's assertion to the contrary, she did not make a listing argument before the ALJ, although she did direct the ALJ to her educational records, including her IQ testing, and asserted her earning record suggested "something of a lifelong pattern that has not improved since high school days." (Tr. 185.) Anderson's prehearing brief likewise did not assert she met or equaled Listing 12.05, although it did address her IQ scores and educational record. (*Id.* at 452-58.)

The paragraph B criteria for Listings 12.04, 12.06, 12.08, 12.11, and 12.15 are identical to the requirements for 12.05B(2)(a)–(d), which requires "extreme" limitations in one out of four, or "marked" limitations in two out of four, of the same four areas of mental functioning. Compare 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)(2)(b) ("paragraph B criteria") to 12.05B(2)(a)–(d). After ALJ Herring determined that Plaintiff only had moderate limitations in those four areas when considering Listings 12.04, 12.06, 12.08, 12.11, and 12.15, ALJ Herring did not need to consider 12.05B because the evidence did not raise a "substantial question" as to whether Plaintiff could meet that Listing. As noted, an "ALJ need not discuss listings that the applicant clearly does not meet." *Sheeks*, 544 F. App'x at 641. ALJ Herring was not required to "spell out every fact a second time" to show why Plaintiff could not meet the requirements of 12.05B. *Bledsoe*, 165 F. App'x at 411. Therefore, ALJ Herring did not commit reversible error by failing to expressly consider listing 12.05B. *See Forman v. Saul*, No. 7:19-CV-043-CHB, 2020 WL 5521038, at *2–5 (E.D. Ky. Sept. 14, 2020) (finding that the record did not raise a substantial question as to whether the plaintiff could meet Listing 12.05B; the ALJ found that the plaintiff could not meet the paragraph B criteria in other Listings and that paragraph B criteria was identical to the requirements in 12.05B(2)(a)-(d).).

This case is also distinguishable from *Reynolds*, cited by Plaintiff. As explained previously, in *Reynolds*, the ALJ determined that the plaintiff had severe physical impairments at Step Two, but at Step Three, failed to analyze if those physical impairments met any Listing at all. 424 F. App'x 415–16. Such is not the case here. ALJ Herring determined that Plaintiff had severe mental impairments at Step Two, and at Step Three, explicitly determined that those mental impairments did not meet Listings 12.04, 12.06, 12.08, 12.11, and 12.15. (R. at 19–20.) That explicit determination made it clear that the record did not raise a substantial issue question about Listing 12.05. *Reynolds* is thus distinguishable. For these reasons, the Undersigned concludes that Plaintiff's allegation of error related to Listing 12.05 is without merit.

*Gang v. Comm'r of Soc. Sec.*, No. 2:20-CV-3267, 2021 WL 2800709, at *13 (S.D. Ohio Jul. 6, 2021), *report and recommendation adopted by* 2021 WL 3488015 (S.D. Ohio Aug. 9, 2021).

Here, like *Gang*, the ALJ addressed the "paragraph B" criteria for Listings 12.03 and 12.04 and found no more than moderate limitations; therefore, the criteria for Listing 12.05(B) were not met and the ALJ did not err by failing to address that listing. That said, however, nowhere in the ALJ's opinion does he discuss Anderson's IQ testing and educational records, despite those records being raised by counsel in both the pre-hearing brief and at the hearing. (Tr. 14-17.) While the Commissioner is correct that outside the listing context, these records significantly predate the alleged onset date, counsel argued to the ALJ

that these records evidence a "lifelong pattern" of cognitive and mental impairments that would affect Anderson's ability to work. (*Id.* at 185, 452-53.)[7]

As explained in detail above, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence. *Shrader*, 2012 WL 5383120, at *6. In addition, an ALJ may not overlook or ignore contrary lines of evidence. *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."). Therefore, this matter must be reversed and remanded.

---

[7] The ALJ's treatment of Anderson's considerable mental health records outside of her hospitalization in two sentences, with no mention of any findings supporting disability other than noting medication compliance had been a problem, provides an additional ground for remand. Although Anderson does not directly raise this error in her brief, the Court can raise such glaring errors *sua sponte*. *See, e.g., Morris v. Comm'r of Soc. Sec.*, No. 2:18-12090, 2019 WL 3755272, at *13 (E.D. Mich. July 18, 2019) (collecting cases), *report and recommendation adopted by* 2019 WL 3753806 (E.D. Mich. Aug. 8, 2019); *Naddra v. Comm'r of Soc. Sec.*, No. 1:16-cv-340, 2016 WL 11268204, at *3 (S.D. Ohio Dec. 22, 2016) (citation omitted), *report and recommendation adopted by* 2017 WL 1194708 (S.D. Ohio Mar. 31, 2017). While this Court does not generally raise issues *sua sponte*, it is warranted in this case, especially as this case is already being remanded.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion

**IT IS SO ORDERED.**

Date: January 31, 2022                          _s/ Jonathan Greenberg_
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge